7 August 2000

 No. 3--99--0996

_________________________________________________________________

 IN THE

 APPELLATE COURT OF ILLINOIS

 THIRD DISTRICT

 A.D., 2000 

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court

OF ILLINOIS, ) of the 13th Judicial Circuit,

 ) Bureau County, Illinois

Plaintiff-Appellee, ) 

 )

v. ) No. 99--CF--25

 ) 

RONALD RUFFIN, ) Honorable

                                ) Scott Madson

Defendant-Appellant. ) Judge, Presiding

_________________________________________________________________

JUSTICE LYTTON delivered the opinion of the court:

_________________________________________________________________

The defendant, Ronald Ruffin, was convicted of unlawful cannabis trafficking (720 ILCS 550/5.1(a) (West 1998)).  He was sentenced to 12 years in prison and ordered to pay a street-value fine of $24,000.  On appeal, the defendant argues: (1) his motion to suppress should have been granted; (2) the State failed to prove beyond a reasonable doubt that the substance possessed by the defendant was cannabis sativa; (3) the State’s improper closing argument denied him a fair trial; (4) his sentence is excessive; and (5) he should be given credit against his fine for 95 days of pre-sentence incarceration.  We hold that the arresting officer detained the defendant longer than was necessary given the reason for the stop and further that the officer lacked a reasonable and articulable suspicion of criminal activity upon which to detain the defendant until the arrival of the canine unit.  Thus, we hold that the defendant’s motion to suppress should have been granted.  We reverse the judgment of the circuit court of Bureau County.

On April 20, 1999, at approximately 7:55 p.m., the defendant and his fiancée were traveling eastbound on Interstate Route 80.  The arresting officer effected a traffic stop at that time because he had determined that the defendant was driving 69 miles per hour, 4 miles per hour over the speed limit of 65.

A videotape shows the stop beginning at 7:57:40 p.m.  The arresting officer approached the defendant’s car and asked for the defendant’s license, telling the defendant that he had been traveling "a little bit fast."  The officer asked the defendant if the car was his and the defendant replied that he had rented the car.  The defendant showed the officer the car rental agreement, and the officer asked if the defendant had rented the car in San Diego.  The defendant replied that he had.  The defendant told the officer that he had been visiting his grandparents in Oakland, California, and he and his fiancée had traveled to San Diego and Tijuana, Mexico, as well.

At 7:59:10, the arresting officer asked the defendant to sit in the officer’s car.  He told the defendant that he was going to write a warning ticket if the defendant’s license was clear.  He asked the defendant about his home town of Rochester, New York.  The defendant and the officer proceeded to sit in the officer’s vehicle.

While they were in the officer’s vehicle, the officer and the defendant conversed about the defendant’s trip to California.  The defendant told the officer that his mother had rented a car in New York for him to drive to California.  The officer asked the defendant when he had left New York.  The defendant answered that he had taken a civil service examination on a Wednesday and they had left the next day, Thursday.  The officer asked if it had been the previous Wednesday, the 14th.  The defendant initially agreed, but immediately corrected himself and stated that they had left New York on the 7th.  The defendant told 
the officer that he was nervous about sitting in a police officer’s car.

According to the defendant, he and his fiancée had stayed in Oakland five or six days and then headed to San Diego with his uncle.  The defendant told the officer that he had not known his uncle very well, and had met him only once or twice before.  They had stayed overnight in San Diego, and the defendant and his uncle had taken the defendant’s fiancée to Tijuana.  On their return to San Diego, the defendant’s uncle had rented another car for the defendant and his fiancée because the gas gauge on the first car was malfunctioning.  After that, the defendant’s uncle returned to Oakland by bus and the defendant and his fiancée had started on their way back to New York.

The defendant told the officer that he and his fiancée were in their third day of traveling.  They had spent the previous two nights in motels, the last one in Kearney, Nebraska.

At 8:05:39, the arresting officer called the dispatcher for a check on the defendant’s driver’s license.  The dispatcher reported at 8:07:05 that the defendant’s driver’s license was suspended effective March 17, 1999.  The defendant told the officer that he had paid a fine to clear his license before leaving New York.  He had a receipt to prove payment, but had forgotten to bring it with him on the trip.  The officer asked the defendant if the defendant’s fiancée had a valid license, and the defendant replied that she did.  The officer then asked the defendant to retrieve his fiancée’s license to be checked.

At 8:08:41, the arresting officer called in the defendant’s fiancée’s driver’s license and asked for the reason for the defendant’s suspension.  The dispatcher told him that the defendant’s license was suspended as the result of a judgment.  The defendant’s fiancée’s license was determined to be valid at 8:09:20.  The arresting officer then advised the defendant that he would be getting a ticket for failure to have a valid license.

The arresting officer asked the defendant to sign the tickets at 8:14:17.  Then he took the defendant’s fiancée’s license back to her and had a conversation, the majority of which was not recorded on the videotape.  In one audible section, the defendant’s fiancée told the officer that authorities in New York had told the defendant to retain the receipt for the clearance of his license because it would take a long time to clarify their records.  According to the officer’s testimony at the motion to suppress, the defendant’s fiancée told him at this time that only she and the defendant had traveled to Tijuana.

At 8:19:20, the arresting officer gave the defendant his tickets.  He told the defendant that the defendant was free to go and said, "Have a safe trip."  At the hearing on the defendant’s motion to suppress, the officer indicated that he did not believe that the defendant was truly free to go at this time.  The officer intended to detain the defendant to effect a search of his car, either by consent or with the assistance of the canine unit.

At 8:19:34, the arresting officer asked the defendant if he had anything illegal in his car.  The defendant replied, "No."  The officer asked the defendant for consent to search the vehicle.  The defendant refused consent, telling the officer that he had personal items in the trunk of the car, including sex toys, vibrators, and lingerie.  The defendant indicated that he did not want his fiancée to see them.  The officer said, "She’s up there, man."  The defendant replied, "I know."  The officer then asked again for consent to search the car.  Again, the defendant refused to consent.  Then the officer told the defendant that he would be detaining the vehicle until the canine unit could arrive for a walk-around.  The defendant then admitted, at 8:20:44, that his fiancée possessed marijuana.

The arresting officer talked to the defendant’s fiancée and recovered a small bag of what appeared to be cannabis.  He then informed the defendant that the defendant was under arrest.  He asked the defendant again if anything else was in the car, telling the defendant that he would find out if the defendant lied.  The defendant said that there was nothing else in the car.

The arresting officer removed the keys from the car’s ignition and unlocked the trunk.  After a brief inspection of the trunk, he said to the defendant, "Now you’re really under arrest."  Inside the trunk, the officer had found approximately 285 pounds of a green leafy substance which he believed to be cannabis.

After his arrest, the defendant moved to suppress the evidence against him.  At the hearing on the defendant’s motion, the arresting officer testified that he became suspicious that the defendant might be involved in illegal activity because the defendant was nervous when approached by the officer.  At the conclusion of the hearing, the trial judge denied the defendant’s motion.  Subsequently, the defendant was convicted of the charged offense and sentenced to 12 years in prison.

On Appeal, the defendant argues that his motion to suppress should have been granted.  Specifically, he argues that he was detained longer than was necessary to address the reason for the stop and that the officer lacked a reasonable and articulable suspicion to further detain him pending the arrival of the canine unit.

The trial court's decision on a motion to suppress will not be reversed unless it is manifestly erroneous.  
People v. Kidd
, 175 Ill. 2d 1, 675 N.E.2d 910 (1996).  Stopping a vehicle for a traffic violation does not justify a search of the person or the vehicle.  
People v. Evans
, 259 Ill. App. 3d 650, 631 N.E.2d 872 (1994).  The initial stop may be broadened into an investigative detention, however, if the officer discov­ers specif­ic, articulable facts which give rise to a reasonable suspicion that the defen­dant has committed, or is about to commit, a crime.  See 
People v. Stewart
, 242 Ill. App. 3d 599, 610 N.E.2d 197 (1993); 
People v. Hardy
, 142 Ill. App. 3d 108, 491 N.E.2d 493 (1986).  Mere hunches and unparticularized suspicions are not enough to justify a broadening of the stop into an investigatory detention.  
People v. Penny
, 188 Ill. App. 3d 499, 544 N.E.2d 1015 (1989).  An investigative detention may last no longer than is reasonably necessary to effectuate its purpose.  
Stewart
, 242 Ill. App. 3d 599, 610 N.E.2d 197.  Although brevity is an important factor in determining whether a detention is unreasonable, the court should also consider whether the police acted diligently in pursuing the investigation.  
People v. Smith
, 208 Ill. App. 3d 44, 566 N.E.2d 939 (1991)
.

I.

In 
People v. Koutsakis
, 272 Ill. App. 3d 159, 649 N.E.2d 605 (1995), this court held that a routine traffic stop may not be used as a subterfuge in order to obtain other evidence based upon a police officer's suspicion.  
Koutsakis
, 272 Ill. App. 3d at 164, 649 N.E.2d at 609.  In that case, Koutsakis was detained between 14 and 20 minutes while the police waited for a drug-sniffing dog to arrive.  The court noted that there "is no talismatic (sic) time beyond which" a traffic stop violates the fourth amendment guarantee against unreasonable searches and seizures.  
Koutsakis
, 272 Ill. App. 3d at 163, 649 N.E.2d at 608.  However, the court noted that the brevity of the stop is an important factor in deter­

min­ing whether the stop was reasonable.  
Koutsakis
, 272 Ill. App. 3d at 163-4, 649 N.E.2d at 608.

In the instant case, the defendant was stopped for speeding, yet the arresting officer did not 
run a check of the defendant’s driver’s license until eight minutes had elapsed.  Then, after the defendant’s fiancée’s license had been confirmed as valid, the officer took another five minutes to write a warning ticket and a traffic ticket.  Another five minutes passed before the officer told the defendant that he was free to go.  In all, the stop lasted nearly 22 minutes from the time the defendant stopped his car on the side of the road to the time the officer first asked the defendant for permission to search the car.  It seems clear
 that the officer was prolonging the stop in an effort to obtain incriminating information from the defendant.  See 
Koutsakis
, 272 Ill. App. 3d at 64, 649 N.E.2d 608.

The State urges us to consider that the stop of the defendant took more time than an average stop because the defendant’s license turned out to have been invalid and additional time was needed to check his fiancée’s license.  The record establishes that the process of checking both the defendant’s license and his fiancée's license took just less than four minutes.  The record further establishes that the officer wrote the defendant’s tickets in about five minutes.  Thus, the "business" portion of the stop lasted approximately 10 minutes.  However, the defendant was detained for more than
 twice that period of time.  The
 detention of the defendant lasted longer than was reasonably necessary to effectuate its purpose.  The length of the defendant’s detention became "a subterfuge in order to obtain other evidence" (
Evans
, 259 Ill. App. 3d 656, 631 N.E.2d at 876) and thus was an unreasonable search and seizure under the fourth amendment.  See 
Koutsakis
, 272 Ill. App. 3d at 163, 649 N.E.2d at 608.

II.

     In 
People v. Sinclair
, 281 Ill. App. 3d 131, 666 N.E.2d 1221 (1996), we found that when a continued detention is unrelated to the purpose of the original traffic stop and is not based upon reasonable and articulable facts giving rise to a suspicion of separate illegal activity, the continued detention 
is an illegal seizure.  The court held that in the absence of probable cause or a reasonable and articulable suspicion, once a person unambiguously withholds his consent to search, the police officer must allow the person to leave and may not continue to intimidate, harass or badger the 
person until consent is obtained.  The stop in 
Sinclair
 lasted 25 minutes.

Here, we find that the arresting officer lacked a reasonable and articulable suspicion to prolong the detention of the defendant beyond his refusal to consent to a search of his vehicle.  At the time the officer told the defendant that he was going to hold him until a canine unit arrived, the officer knew only that the defendant 
was driving a rented car, that he was nervous, and that he was traveling from southern California, where he had visited Mexico, to New York.  
In addition, the officer knew that the defendant and his fiancée disagreed about who had gone to San Diego and Tijuana with them.  These facts support no more than a
 hunch or suspicion of illegal activity.  They do not give rise to a reasonable and articulable suspicion that the defendant was trafficking in cannabis.  Moreover, the defendant refused to consent to a search of his vehicle.  As in 
Sinclair
, the lack of a reasonable and articulable suspicion, coupled with a withholding of consent to search, requires the officer to free the defendant from detention.  Thus, the continued detention of the defendant was a violation of his constitutional rights.

III.

Finally, the State argues that the defendant lacked standing to object to the search of his vehicle.  The State bases its argument on 
People v. Bower
, 291 Ill. App. 3d 1077, 685 N.E.2d 393 (1997).

In 
Bower
, the defendant attempted to rent a car on his own.  The rental agency refused to rent a car to him.  The defendant then called a friend who rented the car in his own name but turned the car over to the defendant immediately upon completing the rental agreement.  When the defendant was stopped for a traffic violation, the police noted that he was not listed as an authorized driver on the car rental agreement.  The police notified the rental agency, and the rental agency asked the police to impound the car.  A search of the car pursuant to the impoundment revealed a large amount of cannabis contained in the car.  The court held that the defendant lacked standing to object to the search of the car.  It said, "the entrustment by a lessee of a rental vehicle to a third party is insufficient to create a reasonable expectation of privacy in that third party where the third party knows the entrustment is without the authority of the vehicle’s owner."  
Bower
, 291 Ill. App. 3d at 1083, 685 N.E.2d at 398.

The case at bar is distinguishable from 
Bower
.  In the instant case, the officer did not contact the rental agency and was not requested by it to impound the car.  Thus, the owner of the car
 did not 
revoke any authority to drive it pursuant to the rental agreement.  In addition, the search of the car in 
Bower
 was not based upon any suspicion of illegal activity.  It was merely incident to the impoundment of the car.  Further, there was no evidence in the case at bar that the defendant knew that his uncle was without authority to entrust the vehicle to him.  Indeed, there is evidence to suggest that the defendant thought that it was perfectly acceptable for his uncle to rent the car for him.  The defendant’s mother had done the same thing for the defendant’s trip to California.  We find, then, that the principle outlined in 
Bower
 does not apply to the current situation.  The defendant in this case did have a reasonable expectation of privacy in the car he was driving.  He had standing to object to the arresting officer’s search.

We hold that the defendant’s motion to suppress should have been granted.  This holding renders moot all other issues raised in the defendant’s brief.

The judgment of the circuit court of Bureau County is reversed.

Reversed. 

SLATER, P.J., and HOMER, J., concur.